Please step up and identify yourselves. Good morning, Your Honors. May it please the Court, Timothy Buckley on behalf of UHY Advisors. Your Honors, I'm appearing today instead of Michael Fawaz, who we had extended this hearing because he had suffered a back injury. And I got a call this morning that he was delayed at DTW, Detroit Airport, having had two Delta flights canceled. So I appear before Your Honors today. Your Honors, as the Court knows... We're going to have both parties identify themselves. Good morning, Your Honors. Nancy Temple, and with me is my colleague Nathaniel Tone on behalf of Martin Mayfield. Thank you. Well, you may not know. 1515, we may let you go longer if there's a lot of questions, but don't go on forever. All right? With that, you may proceed. For the record, Joseph Barber of Howard & Howard is also here today. Well, Your Honors, we respectfully ask the Court to reverse the judgment of the trial court and enter judgment in favor of UHY Advisors. As the Court knows, there are three issues that are presented on this appeal. The first issue on appeal is a dispositive legal question as to the statute of limitations that governs this action. Because this is a dispositive action as to whether or not... governing oral contracts apply, I'd like to devote much of my argument to that issue. I'll briefly touch on the other issues of damages and prejudgment interest and answer any questions the Court may have. A fundamental error that we allege was committed by the trial court is failing to recognize the difference between having a contract on one hand and having an oral contract on the other. The cursory review of what transpired in the trial court demonstrated that the plaintiff alleges that there were breaches of a contract and ceased damages, all based on alleged oral agreements that were made between the parties and not based on a written contract. Now, Illinois courts strictly construe what is considered a written contract for purposes of statute of limitations. And we don't believe that the evidence supports the finding of a written contract. Accordingly, the five-year statute of limitations under 735 ILCS 513-205 would apply. And we'd ask the Court to find as such. It's uncontested that such a finding would mandate the plaintiff's action be dismissed as it was filed nearly three years after the statute of limitations expired. The relationship between the parties in this case was first established in May 2001 with the signing of a job arrangement letter, as it was called. And that contract was signed by both parties. And for purposes of this argument, we'll just call it the JAL. The parties knew how to sign and enter into a formal written agreement at that time, and that that would satisfy the written contract requirements. UHY was a newly formed entity in 2000, having been an amalgamation of accounting firms from different regions that were seeking to take advantage of that amalgamation and consolidate their spending areas for things like office supplies, printing, equipment, etc. The JAL had a duration set of one year. It was May 2001 to November of 2001. It provided for both fixed and contingent fee payments. The fixed payments provided for in the JAL were $150,000, comprised of six payments of $25,000 each. The contingent payments were based on a measurement of savings, and it was timed from December of 2001 through December of 2003. There was to have been advance payments with a subsequent reconciliation. And then an item-for-item comparison was agreed to in the JAL on a per-unit basis. This is all cited to in the record in our brief. The JAL actually gave an example of long-distance minutes, showing how the per-item basis for measuring savings would be done. If you were paying $0.09 a minute before the arrangement and $0.07 a minute after the arrangement for long distance, that difference would be measured against the number of minutes used. So it was clearly an item-by-item, unit-based formula. Now, the oil modifications that were made included the duration of the contract, extending it to June 2004. This was admitted to in testimony by Martin Mayfield's principal when he said that the extension was based on his oil approval. We cited this in our brief on page 26. He also said there was no written acceptance of that change in the duration. Again, our brief, pages 7 to 8 and page 27. And you're saying that this had a limited time frame, but in looking through the record, it appears to me that it was based on what UHY's availability was. So there really isn't a time limit on it, and the extensions were based on UHY's availability throughout. And it even says the parties agreed that the timing issues would be discussed with management on a regular basis, meaning there is no specific defined time limit. I mean, there was times mentioned, but they could be extended. And that's in the JAL. But the extensions were never agreed to in writing. Well, they were and they weren't. They were electronically agreed to. Nothing was signed off on by anyone. That's not totally correct. There's admissions by Berendt that he did sign off. Yeah, I think Berendt said he must have agreed and approved to all four amendments. I mean, that's his testimony. And the existence of a contract is not the issue here. It's, again, whether or not it was actually reduced to writing. And his deposition testimony doesn't change the fact that there was nothing ever reduced and signed off on by the parties as to those extensions. And that's just one of the modifications, Your Honors. Well, all four of them basically are referred to in the JAL, you know, like the contingency thing. Really, this was an open-ended contract with no real specific termination in it. As far as the offer of extensions you're saying? Right. They're all referred to and they all really address issues in the JAL, which you would have to because it says explicitly that they had to come back and show what they did or didn't do by a certain time frame, which they did do. I understand, Your Honor. And so one of the other oral modifications besides the duration was the nature of the fixed payments. Which was an advantage to the UHY in that the other side let them extend them so that they didn't have to make the payments on time. Well, Your Honor, the fixed payments actually increased from the original amount of $150,000 to $431,000. Based on the fact that these terms were being extended. There was no cap in the contract. Well, there was a set number of payments made. Six payments were to be made under the original JAL. Those six payments comprised a total of $150,000. So while there was no way of saying it was a cap, there was a fixed amount shown in there of $150,000, Your Honor. But they never objected to it. Well, I understand, Your Honor. The question isn't whether or not we were bound. The question is whether or not it was in writing. And again, we're trying to focus the fact on this was based on a will. And I'm saying show me explicitly where one of the elements of the contract was not addressed. Your Honor, certainly we can show you that in the chart that we attached to our reply brief, we list a number of items that were not addressed in the original contract. The timing and the measurement of contingent fee payments. Well, as I said, timing was open-ended. So you lose on that immediately. Well, the timing of the contingent fee payments, they were supposed to have been paid up front and then reconciled afterward. That changed as of September of 2002 in John McKay's memorandum. In October of 2002, there were two memorandums, two UH1. Underneath all of this, there's one clear issue. That is, why did you not end the contract or go to arbitration and resolve it? But nobody did that. So I don't see you. That almost kills your argument about the five years. Well, Your Honor. I mean, you yourselves let it go beyond five years. We were reaching out to John McKay, and the evidence in the trial showed that there was e-mails to John McKay to respond to Gerald Berger's objections to the savings percentages, by the way, which were never raised in the original JAL. Those savings percentages were not the measure of how savings were to be determined in the compensation. And did Berger keep the documents? No.  Berger didn't keep his documents. And then later he admitted he didn't look at a lot of the documentation that was in the original agreement. Well, Berger said that he was asking, and actually he sent to Mike Berent the questions that he had on the savings percentages. All the records were available at that time. And Berent kept going to McKay and saying, here's Gerald's issues. Can you address these issues? And McKay admitted that he had no intention of addressing those issues because he was done. He said, we have done enough. Now, this was how the relationship broke down. No communications had occurred until 2010, nearly seven years later, when McKay contacted Bill White. He was absolutely off the charts during that period of time from 2003 to 2010. This is evidence in the record. The fact that the records were then destroyed during the seven-year period is a function of the record retention policy that UHY had, number one. And number two, the changeover of their accounting system. There was no spoliation issue raised at the trial court. No sanctions brought under 219. There was no motion made for sanctions. So spoliation was not an issue in the trial court. The fact that the records went around is a fact that Mr. McKay never responded to Mr. Berent's request to reconcile these percentages with the issues raised by Gerald Berger. That was the reason why they didn't even know he was so acclaimed. They thought McKay had walked away from him until 2010 when he contacted Bill White. But they were still receiving services. You're not receiving services from all of the vendors that had been put in place, but they were receiving from some of them. So they had to realize there was still an agreement going forward. Well, they didn't know McKay had not given up on it. After seven years, you have no idea that you're on notice of there still being a pending claim when you've reached out and haven't had any response. The fact that they changed the formula, I want to focus on the one material term that has changed that is not in the JAL, and that is the fact that unit price savings was the basis on which the original agreement was entered into with these accountants. It was a simple formula. They could understand it. When it changed, and we don't dispute the fact that it was discussed in 2002, but when it changed to a savings percentage formula against not unit item spending but against category spending, that was completely different. And it was completely different for a reason. It was different because it would have been very burdensome to collect all the invoices and do a unit price differential comparison. When that changed, though, it should have been put into writing and signed by the parties. Otherwise, it's a parole piece of evidence. It's evidence that kicks this into the five-year statute of limitations. And that is probably the most material term of it, in addition to the others that I've raised that your Honor has refuted. What's the standard of review on that, whether or not the trial court should have accepted your position that that should be considered parole evidence, thereby changing the relevant statute of limitations? Well, as a matter of law, we believe that it was against the manifest rate of the evidence, your Honor. So no reasonable judge could come to that conclusion? Based on that. Okay. Now, your Honor, the fact that this was all modified leads to the fact that you look at Illinois law, and it's very clear that you must strictly construe a written contract. We have cited to the Armstrong Supreme Court in Armstrong and in the first district case in Toth. Of course, in dicta, Armstrong talks about the finding of a written contract. That was a different kind of a case, and it required looking at an implied term. But it does cite, it cites with approval to Toth that says, if parole evidence is necessary in order to find an essential term of the contract, the five-year statute applies. And that very thing happened in the Toth case, where a supplier was trying to prove the recovery of the claim with a series of memoranda. Paying invoices and monthly statements. That's correct. And in reality, the case says that there was no contract. Well, but because there was no written contract, certainly. There was no evidence of an agreement. Right. That's not the situation we've got here. We've got a written contract. But they had to look at parole evidence in order to find the terms, because there was no promise to pay in any of those memorandas. And I'm saying, I don't totally agree with you. The documents, the four or five elements are there. What may not be there is the fact that they had to explain one of the elements. But that's not saying that the elements are not there. So therefore, parole evidence can be used to explain an element that's present. That doesn't take it out of, that doesn't change which statute applies. That doesn't say there isn't a contract. Your Honor, you're absolutely correct. When you're just explaining a term that is in there, and you can find the term in the original contract, parole evidence is allowed. That's not what we have in this case, though. The essential term, one of the essential terms that was changed, is the way savings were to be measured on which Martin Mayfield's compensation would be determined. That essential term is unit pricing versus savings percentage times category spending. That is not in the JAL at all. So you have to look to parole evidence on that. In their opposition, Mayfield cites the two cases, the Gassner case and the Landmark Properties case, neither one of which deals with the statute of limitations. And in all this time, they could not come up with any authority that's germane to the statute of limitations. Gassner deals with the fact that there was no allegation of an oral contract or discussion of oral contracts. The case was about a written contract and the meaning. The Landmark case is regarding whether or not an arbitration clause would apply. So neither of those cases cited by Martin Mayfield rely on the standard for finding a written versus an oral contract or the terms of the oral contract. Martin Mayfield has confused what's sufficient to create a contract, which they focus on, which we're not contesting that there was a contract. The essential terms of that contract, however, have to be established by looking outside the JAL. Once you look outside the JAL, the five-year statute applies. Now, there's not a single basis for plaintiff's action that we believe exists in the written contract, since we believe those terms were all established by memoranda and emails subsequent to the entry into the JAL. The October and September memoranda in 2002 actually requires sign-off by UHWI's management to the savings percentages that are being suggested or proposed. When they acknowledge the need for sign-off, it shows that there has been no assented at that point in time. And so that essential term had not been agreed to at that time and shows that it did need to be a modification. And McKay admitted that it had been modified orally, and we cite to that in our briefs the relevant testimony at trial. Now, the plaintiff learned or was conscious of their cause of action as late as February 2003, but did not file until April of 2011. It's an easy calculation to see that that goes beyond the five-year statute, which is why we are asking that the claim be dismissed. Judge Smith, just in response to your alluding to the speculation, you know, Center Prize Advisors, UHWI, over that span of time was implementing various changes. One of the changes that they did implement, because of this kind of a combination of separate firms, was their accounting system. They uploaded a lot of the secondary data in order to maintain that unified accounting system. But the invoices, the only things that could have been used to measure unit price savings, were not retained because, again, they were not on notice of any claim from McKay when he stopped responding to Berent's inquiries as to whether or not he could respond. But still, at the same point, the receiving benefits of this agreement, which means, therefore, they are indirectly on notice. The dime is going to hit them sooner or later. Well, that's only if he was maintained, because he had already been paid $431,000. He just didn't receive the contingent fee payments, or he received one, but he had not received the balance of contingent fee payments. We know that he wasn't going to go back in and pull all the invoices, because they had done that in their opportunity assessment, and it was a massive job that took longer than they expected. So that's why they evolved to using the savings percentage times category spending, because you could pretty much do this off the computer run. That was something that was never contained in the JAL. That was a new measurement that should have been evidenced by writing signed off on by the parties, just like the original one was. But what difference does that create? It's a difference of whether there's a written contract in which all essential terms. No, what I'm saying is to the creation of the monies. Of the savings? If they're still using the original, the way it was set up, but they chose different, in effect they chose different products within the group, but at one time they started with $39,000, so that means pretty much so they had chosen all facets. Now you're saying they're specifically choosing individual facets and not all of them. Are you saying, therefore, by the fact that they chose some and not the others, they increased the amount they would get, because certain of them had lesser value, so they took them out? Well, I'm glad you asked that question, because that was what the essence of Gerald Berger's testimony was, was that the percentages, which were supposed to have been blended, had flaws in them. And yes, the savings was not uniform throughout every item within a category. And these blended savings percentages were disputed by Gerald Berger, who was a CFO for the Houston office. But he, again, as I said earlier, did not retain his documentation and then said he did not follow through on it. Well, Gerald Berger sent it to Barrett. Barrett communicated, being a CEO or COO, he communicated with John McKay. As late as the spring of 2003, maybe even into the late spring of 2003, I can't recall exactly, they went to May. But in any event, when he heard nothing back from McKay and they had already paid all the fixed fees, again, it would not have been the unreasonable belief that Martin Mayfield was walking away, because they never heard from him again until 2010. When you say walking away, you mean that since they changed the way they were being compensated, that they were in essence waiving any claim to contingent fees. To contingent fees, by not coming back and justifying those percentages. And what you're saying is that it was that decision that the judge did not make that was against the manifest way to the evidence. Judge Mulroy felt that all the terms were contained in the JAL. And the terms that ultimately were proposed in October of 2002. That is contrary to the evidence. Because the JAL says that savings are to be determined in accordance with a project savings portion of the JAL. And that portion, that project savings portion of it, does not deal with the percentage over category spending. It talks about unit price savings and measuring that differential against actual spending on those units. Is there any evidence that would establish the amount of relative increase that was, that inured to their benefit by changing the formula here? Increase in spending? Increase in benefit to them. In other words, when you, it seems to me that what you're saying is that he's not entitled to the contingency payments because we switched to a different method of payment that he was going to get more money than he would have gotten, he would have gotten under the unit pricing. Is that accurate? No, it's that it's a different measurement. We don't know whether there are more or less. The fact of the matter is it could have been more. And because it changed, there had to be a meeting of the minds on that percentage that was to be used. And there never was one on that. The fact that they were agreeing to... If it's a coulda, shoulda, you know, coulda been situation, how is that against the manifest weight of the evidence for the judge not to go your way? Judge, it's the fact that there was a change that shouldn't have been reduced to writing and signed off on by the parties. That is the key. That was a material change in an essential term. No, I understand what you're saying there. That finding is against the manifest weight. That finding that it was within the original JAL so that it was in writing and the 10-year statute would apply. That's what we're disputing. We're saying that this is a change in an essential term. Once you have to look to an oral agreement or parole evidence to find an essential term, the five-year statute applies and they were untimely in filing the complaint. Okay. I'm still going back to an explanation there as to whether it is a change in an essential term or it's, as I would say, an explanation of the essential term that's already there. You're contesting how it's to be interpreted, which again would come back to the judge saying, I don't buy that, and that's what he didn't buy. That's not what we're saying, though. We're not saying that that was even in the project savings portion of the JAL. There was no discussion of that method of measuring savings in the JAL's project savings portion, which is pointed to within it as the means by which they'll measure Mark Mayfield's compensation. So it's not interpreting the language of unit price savings because there was no percentage discussed in that section. It was supposed to have been a measurement of the savings with each unit category being purchased, and it changed. It evolved to a percentage times category spending. Now, they introduced evidence that the units are contained within the categories. That's what I said before. Right. Well, Your Honor, our expert submitted evidence as to how an error could be compounded across the board by using that conclusion. Without looking at unit prices, it leads to certainly speculative damages, which is another element that we have raised on appeal. Okay. Move on to something else. So, Your Honor, the other issues that I want to briefly touch on was the fact that Chris Leonard was submitted as the damages expert for Mark Mayfield along with John McKay, but Leonard is the one who primarily created the damages report. He had a contingent fee interest in this case because he was getting a percentage of any recovery Martin Mayfield made. But he's not an independent expert. He's a, I guess, fact witness. He's part of the whole mix here. He was a subcontractor of Martin Mayfield. Okay. Yeah. And he had an interest in maximizing the recovery that Martin Mayfield had because he was going to get a percentage of it. So he should not have been an expert. He has a bias, and the courts have recognized that as disqualifying him. Also, he admitted that his calculations were in error, and they had to be done three times, even up to the eve of trial, to correct errors that he made. But the errors were based on your failure to maintain records. Well, those records were available in 2003 when John McKay was asked. But they weren't at that point. I'm sorry, Judge? But you can't get away from the fact that they weren't there when they were to determine what damages there were. So that argument can go either way. I mean, we come back to the manifest weight. You lose on that one because it's shame on you. You were gotten. I mean, on that one, you were gotten. Yeah, it was a burden of proof. You know, the plaintiff carried a burden of proof. The fact that they laid back for seven years. I'm not disagreeing. I questioned that. But they got to get me. When McKay was asked to justify the percentages, the records were available. He never took advantage at that time of the opportunity to go in and show how his percentages were legit and to come to an agreement. Now, in 2013, 2014, when Curtis Leonard is making his damages report, yes, he could not go to the original records because it was so far past the time when they were available. It doesn't change the fact that they were wrong. They were speculative. And the fact that they were speculative and beyond that, he admitted on the stand on cross-examination, yeah, I have to go back and redo them because these are wrong, is a basis to find that the damages were not proven. The burden of proof had not been met. Just quickly, the last item I want to touch on was the prejudgment interest. Prejudgment interest under 815 ISCS 205-2 requires an instrument in writing at the very beginning. We have contested that. In fact, the claim is based on a written instrument. We're saying the essential terms here, particularly Martin Mayfield's compensation based on savings, was based on parole evidence or oral evidence and not the writing. It also needs to be subject to easy and exact computation. In this case, nothing could be further from the truth. It was changed from the time they filed the complaint to the time that they actually got a judgment from Judge Morroy. It changed several times in the course of the preparation of the damages study or the damages report. The calculations kept changing, and the original claim was 20% less than what they were actually awarded. $197,069 was claimed in the complaint, and an award of $154,000 shows that the amount was not readily ascertainable. So you would have paid that amount, but you wouldn't pay the amount the judge came in with. You would have paid more? Well, Judge, let's say the seven-year delay increased the amount of the interest, too. So they can mitigate their damages at all on that. The other thing, just briefly, is that a lot of this, besides the increase caused by the prejudgment interest, the increase for noncompliant spending. There was nothing in the joint arrangement letter about getting money for spending that wasn't within the contract. Again, that's something that we just raised as a side note. It's another element which shows that this wasn't capable of easy and exact computation. All right. Thank you. Thank you, Judge. Nice job. Pinch-hitting. I was going to say, I'm really not the guy from Michigan. Good morning, your honors. I'd like to start with the written contract and clarify, for the record, the evidence that the written contract does contain a savings percentage formula, the exact same formula consistently used by Martin Mayfield in the assessments report presented in July of 2001 that UH YRCA's enterprise advisor signed off on. That's plaintiff's Exhibit 4. It was consistently used in the sourcing supply industry as testified by Mr. Leonard and Mr. McKay and consistently used in every single status report, consistently used to calculate the first quarterly contingency fee. So there wasn't a change? There wasn't a change in the formula. The contract on page 9 talks about 5%. For example, if 5% savings is determined, and that was a very conservative projection because, obviously, until you get into the actual data, you don't know what the actual savings percentage is going to be and until you negotiate the contracts with the suppliers to measure the historical unit costs on a weighted average basis versus what the suppliers were willing to offer to you. But now when he says, let's just say, originally we had 25 items, and he says, oh, you guys changed the ballgame. You just took the best of the 25, which is 5, that cost a lot more, and therefore you're billing us for the percentage on those 5 instead of keeping it at the 25. Yes, and the record shows that's not the case. Notably, UHY never presented any sort of alternative analysis or damages calculation. They admitted that savings occurred. Their own experts said it could be as much as $500,000. He had no idea. They presented no evidence. And the evidence that was presented, which was uncontested, and we need to give deference to the circuit court here, was that Plannist Exhibit 68, which is the results binder, has all the contracts for the different areas of spend that were negotiated with the suppliers. And Plannist Exhibit 4 is from the assessment phase, and that has detailed documentation. For example, on page 3 of 6 in Plannist Exhibit 4, there's an executive summary, and there's a table here. This is page C1382 in the record, and a table says for computers area is the first expense area. The target spend covered by dollars, $1.4 million. Low-end savings percentage, 6%. Mid-range savings percentage, 8%. Again, this is projected because this is before they had actually negotiated the contracts with the suppliers. And then high-end savings percentage. So Martin Mayfield, after the assessment phase, looked at 39,000 historical invoices, conducted interviews of personnel in the various operating firms, talked to vendors, got downloads from vendors to the extent that they could, and analyzed 15 months of accounts payable purchase data by category, computers, travel, telecom, supplies, printing, postage, delivery, shipping, FedEx, UPS, etc. And they came in, and as is common in these complex multi-year consulting arrangements, you have to have continual communications, and it's going to be oral communications, and a written contract provided for the client, CA, to sign off on that historic database before Martin Mayfield would proceed with any further work. Because you don't want to go two years into a project and the client say, oh, we didn't agree with your first phase. So, and there was no dispute. The trial court found, and they admitted, that they signed off on that historic database. So for each category, and it was done on a weighted average basis, so it wasn't skewed towards the biggest savings percentage of, but the low-volume acquisitions. No, it wasn't changed. The formula was the same. So they got the historic. Did they change terms? No, no change in terms. The JAL says on page 9 that we will calculate the project savings, and if we reach our projection of 5 percent, and you spend $14.5 million in annual spend, accounts payable spend, then you multiply the savings percentage of 5 percent times the accounts payable spend, and then we get the contingencies based off of that. The formula never changed. And there's testimony by Mr. McKay and Mr. Leonard who explained, and the trial court found that that formula included unit pricing. It's the same. It's just algebra. It's the same. The accounts payable data under the new supplier contracts, assume it's $10 million, under the new reduced pricing total. But maybe your volume goes up. You buy more staples. Maybe your volume goes down. That $10 million is total volume times the new unit cost under the contracts. So how much did you actually save? You've got to compare it to some historical cost. And if we know for each category, and they calculated for each category, as they did in July of 2001 under the assessment report using actual data, that historical cost for printing on average, weighted average, was, say, $0.10 per item. And we go to the new contract, and it's going to be $0.07 per item. So that's a 30 percent savings right there. So for printing, it would be 30 percent savings. And if you know that in the new regime, under the new contracts, you spend $1 million on printing, but that's a 30 percent discount, as Mr. Leonard and Mr. Kay testified, they would take that $1 million and gross it up, saying under the old regime, if you're now doing 30 percent savings under the old regime, it would have been grossed up and add that amount to the $1 million. So say it's $12 million, $13 million, minus the actual $10 million spent, you still get to the same number. It's still encompassing unit costs, the historical unit cost of $0.10, minus the new contract price of $0.07. That's a 30 percent savings percent. Now, they were projected until they actually calculated the contracts. So when they went and negotiated and UHY admitted that it signed off on all the requests for proposals that went to the potential suppliers, they got the best bid back. UHY and Martin Mayfield helped them negotiate the best contract, but it was UHY's decision. The JL says, it's up to you, UHY. You decide which vendors you want to use, which contracts you want to sign. We'll help you. And Michael Barron testified that he approved it and he signed all those contracts. All those contracts are in the results binder, which is plaintiff's exhibit 68. And attached to each contract was the backup detail of the best bid per item that comes up with a savings percentage for printing items for office supplies. So all that detail is in the record. And Mr. McKay testified about those Excel spreadsheets. It's done on a weighted average basis, too, so that it's not skewed unfavorably. There's no windfall to Martin Mayfield here. So by weighted average, I mean maybe Staples gives you a really good deal if you buy special color paper for an appellate brief cover. It's 50% off if you buy the blue cover. But for regular paper, we're only going to give you a 10% discount. But you're going to buy a lot more white paper than color paper. So Martin Mayfield's formula, which is in the JAL, takes into account the actual volume of the white paper and the savings percentage, which is relatively lower for the more common items. And blue paper might only be bought once a year, and it's weighted average towards its volume. So the formula, again, in page 9, it's a savings percentage of 5% times the annual accounts payable spend. And the accounts payable spend includes the new unit price times the actual volume. So although they were projecting growth, if the volume went down, then the total annual spend would go down and the savings would be less. The formula took into account the volume of different types of things purchased, whether it went up or down, the new unit pricing under the new contracts, as compared to the old contract pricing, unit pricing on the historic database that Centerprise admits that it signed off and agreed to those unit prices. And that's the same, it's just algebra. It's the same as taking... What about his argument that one of the, I don't see EO or whatever, complained and sent documents and that they were never responded to? Berger, yes. Berger was not in the corporate office. He was at one of the operating subsidiaries. And Mr. McKay testified that they did respond to Mr. Berger's comments. He testified that he met with Berent in the corporate office. Because throughout the time period when Martin Mayfield was working on this, Kurt Leonard sat in the corporate office in Chicago with Berent and the other senior management. McKay was there from time to time. And McKay identified, and in the record are every single update reports through 2001-2002 that were addressed to Berent, who was the COO, and that was the primary reporting contact. When Berger raised the question, McKay asked for the detail. And they went back with Leonard, looked at their reports, talked to Berent, and testified that our work was solid. We looked at 39,000 historic invoices. We made sure that each project champion at each operating subsidiary, and one of them was Mr. Berger himself, signed off in that historic database. We interviewed them. We questioned them about what they were buying and why, and what their plans were for the future to accommodate that. And that was signed off on by CA. There was also testimony in the record that at this point in time, in late 2002, when contingency fee payments were due. Why would you wait so long to sue them on this? Mr. McKay testified about that. There was a motive, and I'll answer that. There was a motive for the operating subsidiaries, including Mr. Berger, to challenge the contingency fee payments because corporate was trying to impose that cost upon the individual operating subsidiaries, including Mr. Berger's firm at that time. But Mr. McKay testified that those questions were resolved. January 30, 2003, the final dashboard on savings that Martin Mayfield prepared for that period was sent to CA and Mr. Barrett, and there was no objection. So Mr. McKay testified about the reasons why he waited. The primary person at CA who brought them in was Bob Bastin, the CEO. He got very ill and died eventually, and McKay testified he did not want to go to Mr. Bastin and say, you know, we had this deal, we had this JAL, the first quarter contingency fee is paid, we reconciled according to the written terms of the JAL in the fall of 2002 to actual. We reconfirmed that our projected savings percentages were only 0.7 percent different when we reconciled it to the actual savings percentage in the second quarter. And now we're balking at paying and getting the benefit. He wanted to go to Bastin, but he did not want to bother him when he was literally on his deathbed. After Mr. Bastin left, then Mr. Barrett left. His contract was up in March, the spring of 2003, and he left. So they didn't have Mr. Barrett as a contact. But are they still receiving the benefits of the agreement? Yes, CA was still receiving the benefits, and there's testimony that to this day they still use at least three of the suppliers, Staples, UPS, and Shizano, the printer. So the estimate originally was $1.7 million of annual savings each year, and that was in Plaintiffs' Exhibit 18. So for two years the contingency fees were supposed to be paid. In Plaintiffs' Exhibit 23, which is the invoice for the first contingency fee, quotes from the JAL, the formula to use to calculate savings, says we calculated it and attached to it is the spreadsheet using the exact same formula that was used to estimate it in the assessment phase in July of 2001. And they paid that. Now the JAL says you, UHY, are going to pay the first quarter at the beginning of the quarter, on March 1st, based on projected, and then we'll true it up. We'll have a reconciliation. So the JAL does talk about this reconciliation that occurred in the fall of 2002. Martin Mayfield, you know, in these business relationships they have to sit down and have discussions with their clients and have meetings and have oral discussions. Mr. McKay testified that it wasn't a modification. There was no material term changed in the JAL. The formula was in the JAL. All they did was reconcile the actual results, and they reconfirmed that the projected savings percentages, guess what, were less than 1% differential from the projected to the actual. So it's just there's no material change in the contract. It was a written contract, and we think the trial court got it right. So you're saying that the 10-year statute applies and that none of the four alleged changes in effect were not in the JAL? That's correct. So the four alleged changes, most of them are timing issues, as your honors recognize. And Mr. McKay testified and Mr. Barrett testified. They did prepare written amendments. Mr. McKay, Martin Mayfield kept only the electronic unsigned copies of those. McKay testified that Barrett physically signed those in his presence. The JAL that plaintiffs use is Trial Exhibit 1, which is signed by both parties. The addendum extending the time frame in Plaintiffs' Exhibit 3, 9, 15, and 22, the record is that the parties did physically sign above their typewritten names. Barrett testified of that, White admitted that, and McKay testified of that. And on the landmark case, we believe that is more than sufficient written acceptance. They paid according to those timing extensions. The only alleged difference of terms on page 9 of the defendant's reply brief in that chart has to do with actual savings percentages. And it's just semantics. It's just algebra. It's no change in the formula. The contract does, JAL does talk about, for example, if the old historic price is $0.09 per unit and the new contract price is $0.07 per unit, that's a $0.02 differential, then the savings would be determined by multiplying by the volume under the new contract. That's exactly what the formula is on page 9 of the JAL. That's exactly what the savings percentage formula is. It's taking the actual volume times the new contract price and measuring the differential between the new contract price and the historic unit database price. That is the savings percentage. The old historic database price minus the new contract unit price times the actual volume spent. That's the same formula. There's no material modification. Okay. Can we address prejudgment interest since he seemed to want to bang away at that? Yes. It is based on a written instrument, the JAL. The formula's in there. It's based on a formula. The cases say that... I mean, there's nothing but formulas in this case. Not that any of them are easy to understand. You talk about algebra. There are no algebra majors up here. Yes, and that's why they take issue with Mr. Leonard and Mr. McKay calculating the damages here. But they have expertise working at Arthur Anderson, calculating these types of savings percentages and other supply source arrangements. They have expertise in that particular area using Excel spreadsheets, et cetera. And Mr. Leonard, he wasn't retained as an expert witness by any lawyer. He testified that his compensation... I don't think we're so worried about that. Okay. But it's whether or not this is something that is easily calculable based upon a written instrument. It is. It is. There's a formula. It's easily calculable. You've got the historic database. You've got the written instrument that says, we're going to use sampling of the historical invoices. We're going to use sampling and we're going to investigate and have you sign off on the historic database to make sure that it's a typical, the word typical and weighted average are used in the JAL. So CA knew what it was getting into, that it was going to be based on samples, and there's testimony that it was an 80% sample coverage on the historic database. And the formula is in the contract. When there's a contract formula, the cases are clear. You can calculate it. The other very critical thing that CA... Do you have cases, though, where they have, you know, Well, you know, I guess maybe I spent too much time with the formula. It doesn't seem as complex to me, but... But, yeah, you're living this case, okay? Yes, yes. And I understand it, and I don't think it's that complicated either. I just think I keep going back to the one issue, the how you choose which products you are going to say. The one thing is you had the formula, and then it says it's a basket. Well, the question is what part of the basket do you use? So now we're at prejudgment interest. Are we using the same formula for that? Yes, it's the same formula throughout. In this basket pricing concept, it all depends on what Centerprise Advisors did, what UHY, how they actually spent, what they actually spent on. What they bought. Yes, and so that's why the historic analysis was done. In the contract, the JAL says if UHY decides to buy differently or not buy a new product for some reason, they have the option to substitute and say, Wait a second, you know, this weighted average basket pricing that you calculated based on a historical spend, we're all of a sudden changing this mix somehow, and we're going to buy something brand new, or not buy this, you know, computers anymore. But they never came, they had that option of the contract. They signed off on the typical mix in the historic database. They had the option to come and say they negotiated and signed the contracts to buy these same items from the new suppliers, and they never came and said to Martin Mayfield, Oh, but now our spending patterns have changed, our basket has changed so much that we need to change and adjust the formula somehow. They admitted they never did that. So one, and I may be going off, but before you go on, the fact that some of the seven did not buy from those contractors means that they created their own price, pricing. Which affects the basket. But you're not looking at the basket that they didn't buy, you're just using the basket of what's left. So your basket may get smaller because they didn't follow the contract. Right, there's a portion where they didn't comply with the contract, but they never came back and said that we're buying something entirely different, so you need to reprice the basket. And the beauty about the formula, it takes into account any shifts in the volume. If somebody all of a sudden doesn't buy as much paper, it's reflected in the actual total dollar amount spent, the volume spent. Okay, going back to prejudgment interest. Yes, and the cases that we cited in our brief that deal with formulas, the Michigan Avenue National Bank of Chicago v. Evans case, there was an issue about what was included in gross sales. So that was litigated, there was a formula, so once that was determined, legally determined, the figures could be plugged in and prejudgment interest was awarded based on that formula. The LaGrange Metal Products also involved unit pricing and what units would be included in that formula was litigated and once that was determined, the formula contract, the contract formula as determined by the court, then was used and prejudgment interest was applied. So it's our position that those cases are more similar to this case. What about where he says two cases don't apply? Was it Gassner? Gassner, yes. He didn't like that case because he said it didn't address a similar situation. It addressed a different form of contract. Gassner deals with the statute of limitations issue. There was a written contract and the trial court admitted parole evidence to help explain some of the terms. The defendant argued that, wait a second, that means it's an oral contract under the five-year statute of limitations and the court held no. You still have a written contract. You can still have parole evidence. And here we have evidence of performance too and it's not parole evidence before the contract was signed  This is evidence of performance and how the parties interpreted the contract from after they signed the JL in May of 01, in the July 2001 assessment phase, the same percentage formula was used throughout every single update through the fall of 01, winter of 01, spring of 02, fall of 02. So for at least that period of time, they can't cry about the basket. That's right. They're crying all along. The contract is very clear that Centerprise, UHY, was required on its own, it will track and measure the savings to be used to pay the contingency fee invoices, that if it wanted to, Centerprise could have hired Martin Mayfield in a separate engagement to do that. There's no dispute. Everyone testified, Barron, White, McKay, Leonard, that CA never retained Martin Mayfield to track the savings. It was CA's data. Martin Mayfield did prepare a dashboard, Excel formulas, an Excel spreadsheet, that in January 2003, the last one was submitted, Leonard testified he turned over all the electronic files, explained to Bill White how to do this, and set it up so they could track both the savings percentages and how much they were complying. And so there's no dispute here, they don't even argue, that the finding that CA breached the contract by not calculating the savings, using its own data at the time during the remaining seven-month periods for the contingency fee periods, over the two-year period, by not calculating it, they breached the contract. And we didn't bring a separate exfoliation claim, but they can't destroy the evidence, breach the contract and not calculate it, destroy the evidence, and then later come back and say, ah-ha, you can't calculate damages now. So the law does not, you know, the cases are pretty clear that if you control performance, and prevent it from happening, you can't take advantage of it. And it's a prima facie presumption, but they never came back with any evidence to show anything to the country. They had no expert, they had nothing. We did have some detail from the time that the work was actually performed. We used what we could there. We got a little bit of accounts payable spend data, which was plugged into the formula. Mr. Leonard testified that was the difference between the first damage calculation and the second one. And then the third, plaintiff's Exhibit 72, which is the figure Judge Mulroy accepted, he made a correction of $6,000 and allocated the formula. You got information from the suppliers too, right? In calculating the historic database, in the discovery in the case, we tried to go to the suppliers and serve subpoenas, but they did not have the data to recreate, so to speak, what UHY had actually destroyed. So I think the key on the prejudgment interest is it's discretion of the trial court, the purpose is to make the plaintiff whole. Mr. McKay did explain about having no client contact to follow up with, and Barrett was gone and Bashan had passed away. There is a 10-year statute of limitations on a written contract for a reason. In these particular circumstances where there is no argument that UHY breached by not calculating the savings, not preserving the records, and not paying the contingency fees, they got a benefit. We submitted the evidence calculating based on available data and using the same formula of the written contract, they can't now benefit from destroying that data. Unless if there's any other questions, I think. No, thank you very much. Thank you, your honors. Mr. Buckley, what's your first name and what firm are you with? Timothy Buckley Howard & Howard. Okay. We still have some time left? Yeah, sure. I'll keep it short, Judge. Well, thank you again. So much of this case rests on what is contained in the JAL. Counsel has pointed to specific language on a specific page of the JAL for justifying where she believes Martin Mayfield's weighted percentage average was found. She points to page 9 of that contract, which is AO 25 of the record in our original brief. Now, the language that she points to, and I would urge your honors to take a look at this contract if you haven't already. We have. There's the second full paragraph. Assuming we reach projected savings of 5% over $14.5 million of annual spend, Martin Mayfield will be paid contingency fees of $181,250 in the first year of the supplier contracts. It goes on. That is in a session called Project Fees. That was not used as the basis for how compensation would be determined from savings. It was not something that Martin Mayfield sold this deal on. They sold the deal on the language in the paragraph immediately preceding which said financial savings will be calculated per the project savings quote-unquote section above. Now, you will not find any language in the project savings section regarding a weighted average. It talks about the savings will include actual volumes going forward extended against the unit pricing. That's how they sold this deal to UHY. And the fact that unit pricing was the key to this, it was easily understood. And the example which follows, the long-distance minutes example, is what made it so simple. The difference between the price extended over your actual purchasing. That was something anybody could understand. I have to say, Judge Smith has the advantage on me in finding that this formula that they talked about is so simple and easily understood because it requires use of industry standards, basket formulas, none of which are contained in the project savings section. The fact that they have talked about project savings, a project, I'm sorry, weighted average savings later, a weighted average percentages to calculate savings would have been something that I think would have required more detail such as what Gerald Berger did ask for. After the fact. When they were presented in 2002. When this deal changed, because that's the moment that the deal changed. The deal changed in October when John McKay proposed in that October memorandum that we would go to a weighted average percentage. And he says this would stop us or prevent us from having to collect all the invoices and save considerable man hours. There was a change being made there. It was not in the original JAL because all of that would have been discussed at that time and would have been incorporated into the agreement which was drafted by Mr. McKay and his partner. So the weighted average formula, while it might have been something that Martin Mayfield agreed to in October of 2002, provided that those percentages, I mean they were going at night but now last night, it's the same goes, let's see the percentages and see if we can agree to it. Because if we can, we can go forward on that. That's what broke down. But they might have agreed to this change but it was a change. It was something that wasn't in the JAL. And if you look at that project savings portion of the contract, of the JAL, you'll find that when the example is given, it's given following the use of the term, measuring the differences based on unit pricing of the spending going forward. Now, I also want to point out that on page 9, it's talking about what you can expect to be paying. Assuming a percentage of, a 5% savings percentage of total spend. This was not intended to be used as the formula. It was to be used so that they can project what they'd be paying. You know what you're telling me, Counsel? What's that, Judge? Is your guys didn't know how to deal with a contract. They didn't know what the hell they were doing. And I would have loved to have had this contract because I could have made a lot more money on it. They just did a horse shit job. Our guys being the accounting firm. Your guys didn't know how to negotiate a deal. Well, that might be true, Judge. But the fact of the matter is when they rely on the project savings as the language where that will be calculated, that's what has to be used. But they left it open-ended. I could have written this contract much easier. Well, it could have been written with more specificity. And I wouldn't sell to them. It certainly could have been written using the formula they ended up wanting to use. But they didn't. All right, we're done. Judge, just one last thing. I just want to say that the damages must be reasonably base. The fact that documents were missing and some chunks of information was used. By the way, there was evidence that the gentleman, Kurt Leonard, who produced the damages report, he did have actual data to use that he didn't use. He chose not to. But they must be reasonably base. Whatever they used, yes, there is case law that says if the records aren't available, you can use extrapolations or assumptions. However, the expert at trial found that the assumptions they used were unreasonable. And those unreasonably base damages calculations were attacked. But you guys gave a number yourselves. And the interesting thing, Judge Mulroy, who was very hard to get stimulated, obviously was stimulated when he gave more than what they asked for. So it sounds like at the trial level there was some heated, well, just whatever. When Judge Mulroy said that there were experts he found credible after they had admitted that they screwed it up, it's one of the reasons we're on appeal. All right. Thank you, Judge. You did a nice job. Thank you, Darren. I'd hire you. I'm writing a contract. And you also did an excellent job. Both sides, this is one of the better prepared cases I've seen. So thank you both. Thank you very much. Thank you.